IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TAMMY L. CRAWFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-949-GMS-SRF |
| | ) | |
| GEORGE & LYNCH, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this sexual harassment, gender discrimination, and retaliation action brought under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII"), are the following motions: (1) a motion for summary judgment, filed by defendants George & Lynch, Inc. ("G&L" or "Defendant") and Leonard J. Brooks, Jr. ("Brooks")[1] on July 31, 2012 (D.I. 156); and (2) a motion for partial summary judgment, filed by plaintiff Tammy L. Crawford ("Crawford" or "Plaintiff") on July 31, 2012 (D.I. 157).[2]  For the following reasons, I recommend that the court grant-in-part and deny-in-part G&L's motion for summary judgment

---

[1] I recommended dismissal of defendant Leonard J. Brooks, Jr. and plaintiff Crawford Trucking Company, LLC ("CTC") as to all counts of the complaint in my Report and Recommendation dated July 5, 2012. (D.I. 149) No objections to the Report and Recommendation were filed by either party. The Report and Recommendation was subsequently adopted by this court. (D.I. 198)

[2] Also pending before the court are: (1) G&L's motion to preclude the testimony or report of Elizabeth Watson Gramigna ("Gramigna") (D.I. 155); (2) Crawford's motion to strike (D.I. 167); and (3) G&L's motion to strike and for sanctions (D.I. 185). The court addresses the motions to strike in a separate Report and Recommendation issued contemporaneously herewith. The court likewise addresses the motion to preclude Gramigna's expert report and testimony in a separate Report and Recommendation.

and deny Crawford's motion for partial summary judgment.

## II.    BACKGROUND

Crawford initiated the instant harassment, discrimination, and retaliation action against

G&L by filing a complaint in this court on November 5, 2010. (D.I. 1)  Crawford filed an

amended complaint on March 7, 2012, alleging causes of action for: (1) hostile work

environment under Title VII; (2) gender discrimination; (3) retaliation; (4) promissory estoppel /

detrimental reliance;[3] and (5) breach of covenant of good faith and fair dealing. (D.I. 57 at ¶¶

110-50)  On July 5, 2012, this court recommended dismissal of all claims asserted by CTC, as

well as Crawford's claims against defendant Brooks. (D.I. 149)  The court adopted the Report

and Recommendation on December 6, 2012. (D.I. 198)  On July 31, 2012, G&L and Crawford

each filed a motion for summary judgment. (D.I. 156, 157)

G&L is an infrastructure contractor headquartered in Dover, Delaware. (D.I. 160 at

A109)  In 2004, G&L formed a joint venture with Haines & Kibblehouse ("H&K") called River

Asphalt, LLC ("River") for purposes of operating an asphalt plant in Dagsboro, Delaware ("River

I"). (D.I. 161 at A328)  Each company maintains a separate office on the River I site. (D.I. 160

at A109)  Executives from G&L and H&K meet on a monthly basis in Dover, Delaware to

discuss River business and operations. (D.I. 161 at A328)  In 2007, River entered into an

agreement to operate an asphalt plant in Delmar, Delaware ("River II"), and exercised its option

to buy the plant in July 2008. (*Id.*)

---

[3]In the amended complaint, the misnumbered retaliation and promissory estoppel / detrimental reliance claims are both listed as "Count III." For purposes of this Report and Recommendation, the claim for promissory estoppel / detrimental reliance will be identified as "Count IV," and the claim for breach of the covenant of good faith and fair dealing will be identified as "Count V."

Before River II was acquired, Michael Bursich ("Bursich") received all orders at River I and scheduled the trucks for delivery, with some assistance from Bob Martin ("Martin"). (D.I. 161 at A241-42) When River II was acquired, G&L general manager Kevin Jones ("Jones") created three new positions to share the work created by the acquisition of the additional plant. (D.I. 161 at A244-45, A342) Jones assigned Bursich to take over Jones' customer relations and sales duties, and reassigned Bursich's order processing duties among two dispatchers and an Order Processor Manager ("OPC Manager"). (D.I. 161 at A244-45, A138) G&L hired Roberta Hall ("Hall") and Michelle Webb as dispatchers. (D.I. 161 at A349) The new OPC Manager position, which was filled by Crawford, was intended to resolve the issue of unreconciled wait time, in which truck drivers receive payment for any time spent in the yard waiting for a load beyond thirty minutes. (D.I. 161 at A154, A303, A341, A349) As the OPC Manager, Crawford was instructed to implement a system for efficiently scheduling the trucks, thereby preventing wait time from accruing. (D.I. 161 at A319, A303, A342)

Prior to working for G&L, Crawford owned and worked for CTC, a company that had contracted with G&L as a hired truck hauler since 2005. (D.I. 171 at P1, P23; D.I. 174 at P669) Bursich and Martin recruited Crawford for the position of OPC Manager at G&L in 2008. (D.I. 173 at P451) During her interview with Jones and Brooks at G&L, Crawford expressed concern that accepting the position at G&L might adversely affect G&L's business relationship with CTC, but she accepted the position after receiving assurances from them that G&L's relationship with CTC would not be affected by her employment with G&L. (D.I. 174 at P419-21, P423-24)

Crawford began working for G&L on June 19, 2008. (D.I. 174 at P670; D.I. 171 at P19, P29) On her first day of work, Crawford met with Kathryn Murphy ("Murphy"), the human

3

resources manager, for a new-hire orientation. (D.I. 161 at A200-01, A349) G&L contends that

Murphy gave Crawford a copy of the anti-harassment policy and reviewed the policy with her

during the orientation, instructing Crawford to contact her about any conflict with other G&L

personnel. (D.I. 161 at A192-95, A151-52, A159, A350) Crawford denies that anyone at G&L

reviewed the policy with her. (D.I. 174 at 670) The anti-harassment policy explained the

procedure for reporting a complaint of harassment as follows:

> Any employee who believes that he/she has been sexually harassed should report
> the harassment immediately to **Leonard Brooks, Jr.** Timely reporting is critical
> to G&L's efforts to remedy situations promptly before problems develop.
> \*\*\*
> **Will Robinson** is always accessible to any employee who has a sexual-
> harassment complaint.

(D.I. 160 at A1-2) The policy listed the former president, Will Robinson ("Robinson"), instead

of the current president, Dennis Dinger ("Dinger"), as an accessible person. (D.I. 172 at P258-

60) G&L did not provide training regarding proper implementation of the policy aside from

supplying a copy of the policy itself at new hire orientations. (D.I. 172 at P271)

At the time she was hired, Crawford was provided a company-issued cell phone that was

pre-programmed with certain phone numbers. (D.I. 161 at A153, A161) Murphy indicated that

these numbers included all G&L management personnel, including Jones, Brooks, Robinson, and

others. (D.I. 161 at A335)

Crawford and Hall worked together in a small office at River I in Dagsboro. (D.I. 161 at

A140-41, A252; D.I. 171 at P21) Bursich, who previously performed Crawford's duties, trained

Crawford for approximately two weeks on how to use a rotation system to prevent the accrual of

wait time. (D.I. 161 at A242-43, A245, A288; D.I. 172 at P331-36) During this two week

4

training period, Bursich maintained primary responsibility for scheduling trucks, and Crawford did not take over the scheduling duties until July 2008. (D.I. 161 at A260; D.I. 172 at P328-31; D.I. 173 at P533) After the training period, Bursich spent about an hour per day in the office, and spent the remainder of the day in the field. (D.I. 160 at A115; D.I. 161 at A253, A246) Jones had previously told Crawford that Bursich would not return to the office after the two-week training period. (D.I. 173 at P434, P524)

Soon after Crawford assumed responsibility for scheduling the trucks, Bursich began to receive complaints from truckers that Crawford was favoring CTC haulers. Some truck drivers indicated that Crawford had refused to place them on the rotation unless they agreed to work for CTC. (D.I. 160 at A103) In addition, truck drivers reported that Frank Crawford, Crawford's husband, had told them that his "old lady" was "running things" at G&L. (D.I. 161 at A304-05; D.I. 160 at A114-15) Bursich warned Crawford not to give CTC preferential treatment in scheduling trucks, but Crawford disregarded Bursich's warnings. (D.I. 161 at A271, A287-88; D.I. 160 at A3-8, A108)

Other issues with Crawford's performance began to arise, including Crawford's failure to effectively address the wait-time issue and her practice of regularly conducting CTC business during her workday at G&L. (D.I. 160 at A98-101; D.I. 161 at A129-30) On July 21, 2008, River held its monthly operations meeting, during which the wait-time problem was discussed. (D.I. 161 at A328, A340-41, A344) Members of the management team expressed concern that Crawford had been hired to address the problem of wait time, but no improvement had occurred in over a month. (D.I. 161 at A342, A344) Jones suggested moving Crawford to the Dover office, where she would not be interrupted as frequently and where she could speak with Jones at

5

any time.  (D.I. 161 at A302-03, A318-19, A343)

Crawford contends that Bursich sexually harassed her on a daily basis during the six week period he supervised her.  (D.I. 173 at P447; D.I. 174 at P671-73)  Crawford alleges that the harassment included inappropriate physical touching, sexually charged verbal conduct, and intimidating non-verbal conduct.  (D.I. 174 at P671-73; D.I. 171 at P61-62)  Crawford's allegations range from the innocuous (saying "blue is my favorite color" when Crawford was wearing a blue shirt), to the potentially injurious (putting both arms around Crawford's neck while disciplining her about a trucker).  (D.I. 174 at P671-72)

Crawford rearranged the desks in the office to keep Bursich at bay and repeatedly told Bursich to stop.  (D.I. 174 at P672-73; D.I. 173 at P519-20)  When Crawford's efforts failed, she consulted G&L's sexual harassment policy and attempted to report the harassment by calling Robinson.  (D.I. 174 at P673-74; D.I. 173 at P474-75)  Crawford contends that she was unable to reach Robinson by any of the listed phone numbers.[4]  *Id.*  Crawford did not attempt to contact Brooks because Bursich had indicated that he and Brooks were friends.  (D.I. 174 at P673) Moreover, Crawford learned that Bursich had previously engaged in a consensual relationship with a female subordinate named Mollie Boyce ("Boyce"), and Brooks had involuntarily transferred Boyce when the relationship became known, whereas Bursich was not disciplined. (D.I. 171 at P67, P74; D.I. 174 at P673)  Bursich never received individual or other training regarding G&L's sexual harassment policy after the incident with Boyce.  (D.I. 172 at P317, P388)

---

[4]Crawford failed to produce any telephone records in support of her contention that she tried to call Robinson, and G&L alleges that Crawford's telephone records reflect no calls made to Robinson from her home, cell, or office phone during July 2008.  (D.I. 180 at 4)

6

On or about July 30, 2008,[5] Crawford complained about the harassment by Bursich to Joseph Taylor ("Taylor"), a regional manager for H&K who visited the Dagsboro office to oversee River's operations on a daily basis. (D.I. 174 at P674; D.I. 160 at A16; D.I. 173 at P471-72, P529; D.I. 171 at P74)  Taylor confirmed that Crawford complained about Bursich, but denied that Crawford identified Bursich's conduct as sexual harassment. (D.I. 174 at P655-56)

On or about July 30, 2008,[6] Crawford complained about Bursich's conduct to John Shetzler, who was a supervisor and a large shareholder at G&L, but was not Crawford's supervisor and was not in Crawford's chain of command. (D.I. 173 at P447; D.I. 171 at P59, P65; D.I. 174 at P637; D.I. 160 at A16; D.I. 161 at A214, A216)  Shetzler allegedly responded that he hadn't "seen [Bursich] do it." (D.I. 174 at P674)  Shetzler contends that Crawford called him to complain about Bursich, but denies that Crawford accused Bursich of sexually harassing her. (D.I. 161 at A214; D.I. 174 at P639)  The record reflects uncertainty as to whether Shetzler informed Brooks of Crawford's allegations, whether Shetzler told Bursich, who then discussed the matter with Brooks, or whether Shetzler did not inform anyone. (D.I. 161 at A220-23, A217; D.I. 160 at A115)  Bursich contends that Brooks questioned him about Shetzler's statements, and he denied Crawford's claim. (D.I. 171 at P70-71)  Bursich alleges that nothing else was said to him about the allegations, and he was transferred to the position of OPC Manager thereafter. (*Id.*)

---

[5] The record contains inconsistencies regarding whether Crawford contacted Taylor before or after she was transferred to Dover. (D.I. 160 at A16; D.I. 174 at P655-58)

[6] Discrepancies in Crawford's testimony exist as to whether she reported the harassment to Shetzler on July 30, 2008 or July 31, 2008. (D.I. 174 at P674; D.I. 160 at A16)

On July 31, 2008, only one day after Crawford allegedly complained to Shetzler about the sexual harassment, Jones reassigned Crawford to the Dover office and informed her that she would remain there until the wait-time issue was resolved. (D.I. 160 at A88, A94) Crawford never spoke to or interacted with Bursich after her transfer to the Dover office. (D.I. 161 at A145-46) Crawford was told that she was not eligible for overtime pay,[7] she was assigned Brooks as her new supervisor, and she was replaced by Bursich in her position as OPC Manager. (D.I. 171 at P95; D.I. 173 at P457; D.I. 174 at P675) Crawford was not aware of the plans to reassign her until the day she was transferred, and there is no written documentation of G&L's plans to transfer either Crawford or Bursich. (*Id.*; D.I. 172 at P285-86, P288)

Crawford called Taylor to complain about her reassignment, and mentioned her issues with Bursich generally. (D.I. 161 at A231, A235) Taylor encouraged Crawford to raise her complaints with Dinger or another member of G&L management. (D.I. 161 at A232-33, A235) Taylor did not tell anyone at G&L about the call. (D.I. 161 at A234)

After Bursich replaced Crawford as OPC Manager, Crawford alleges that he used his position to retaliate against her by implementing a system for scheduling haulers that disfavored CTC trucks. (D.I. 161 at A256-59; D.I. 172 at P340-41) Following Bursich's placement in the OPC Manager position, CTC's business with G&L dropped, and the companies ceased doing business with each other on September 3, 2008. (D.I. 160 at A75-78, A3-8; D.I. 174 at 667; D.I. 171 at P26-28)

---

[7]Evidence in the record suggests that, as a salaried employee, Crawford was never eligible to receive overtime pay, and she initially received it as a result of an error in the payroll system. (D.I. 171 at P95) On July 31, 2008, Crawford was informed that the error would be corrected and that she would no longer receive overtime pay. (*Id.*)

8

Frank Crawford complained that CTC's trucks were being treated unfairly under Bursich, but no investigation ensued. (D.I. 174 at P666-67) Frank Crawford insisted that he never told Hall or anyone else that CTC would not do business with G&L, and notes that he had to look for alternate work due to the drastic reduction in business. (D.I. 173 at P407; D.I. 174 at P667) However, G&L presented evidence suggesting that Frank Crawford instructed G&L to pull his trucks out of the rotation. (D.I. 171 at P45, P107-08; D.I. 173 at P534-36)

Crawford contends that she did not have enough work to remain occupied in Dover. (D.I. 160 at A51, A53-54, A59; D.I. 161 at A171-74; D.I. 173 at P495, P497-99; D.I. 174 at P675) Crawford continued to conduct CTC business during working hours, despite Bursich's warnings. (D.I. 160 at A74) Jones indicated that Crawford would be laid off if she continued to do work for CTC while being paid by G&L. (D.I. 160 at A25; D.I. 161 at A321)

During her first two weeks of work at the Dover office, Crawford initiated a Charge of Discrimination (the "Charge") at the Delaware Department of Labor ("DDOL"), alleging that she had been sexually harassed and retaliated against. (D.I. 160 at A20, A24-25; D.I. 161 at A163) DDOL investigator Gabrielle Reeves ("Reeves") conducted interviews with Boyce, Brooks, and Bursich. (D.I. 171 at P67, P97-98) Reeves indicated that Brooks knew of Crawford's complaint, and that Bursich assumed the position of OPC Manager after Brooks spoke with him about Crawford's allegations. (D.I. 174 at P616-20) On September 22, 2008, Crawford's Charge was formally processed by the DDOL, and G&L received it on September 29, 2008. (D.I. 160 at A95) Upon receiving the Charge, Brooks began investigating the allegations in the complaint. (D.I. 161 at A327; D.I. 172 at P300)

9

On September 3, 2008, a CTC driver assigned to River II told the plant superintendent that Frank Crawford had instructed him to leave the yard for the day. (D.I. 161 at A294-95; D.I. 160 at A80) Frank Crawford then called Hall at River I to complain that CTC trucks were not getting enough work at River II, informing Hall that he was pulling all of CTC's trucks out of both plants and instructing her to take them out of the rotation permanently.[8] (D.I. 160 at A75-77; D.I. 161 at A261-64, A278-79) Hall told Frank Crawford to speak with Bursich, whose job duties included handling trucker issues and complaints, but Frank Crawford refused to do so and informed the plant superintendent at River II that he was taking his trucks out of the rotation. (D.I. 161 at A266, A280-81; D.I. 160 at A75-77) His request was honored, and CTC's trucks were not placed in the rotation. (D.I. 160 at A106, A108; D.I. 161 at A276-77, A283) G&L has not requested that CTC perform any work since the relationship ended, with the exception of a request for bid which was sent to CTC in 2010 as part of a bid process directed to eligible businesses owned and operated by minorities and women. (D.I. 171 at P221-22; D.I. 172 at P323)

On September 11, 2008, Jones informed Crawford that she would not be able to return to River I. (D.I. 161 at A175-76) The wait-time was current by the end of September 2008, and as a result, Crawford had no further work to do on the wait-time project. (D.I. 161 at A343) On September 15, 2008, Jones told Crawford that he suspected she would be laid off because there was no longer a need for her position. (D.I. 160 at A55-56; D.I. 161 at A165-66) Brooks

---

[8]Frank Crawford disputes G&L's contention that he called Hall demanding to have CTC's trucks removed from the rotation. (D.I. 161 at A185; D.I. 173 at P414; D.I. 174 at P667 ¶¶ 11, 18) However, Frank Crawford's own phone records refute his contentions and support Hall's testimony that he called her at 8:04 a.m. on September 3, 2008 to request that CTC's trucks be taken out of the rotation. (D.I. 160 at A78, A75-77; D.I. 161 at A292-93)

informed Crawford that she had been laid off on September 18, 2008. (D.I. 160 at A82; D.I. 161 at A134-35) The reason given was that she completed her project and resolved the problem, and there were no documented complaints, disciplinary actions, or other adverse notations in Crawford's employment file or elsewhere. (D.I. 172 at P275, P278; D.I. 174 at P593; D.I. 173 at P553; D.I. 171 at P210, P214)

On September 19, 2008, Crawford talked to Taylor about the layoff, and he encouraged Crawford to speak to G&L management. Crawford did not do so, claiming that there was no reason to contact them because she had already been laid off. (D.I. 161at A178-80, A235-36; D.I. 160 at A60, A69) On the same day, Frank Crawford went to the Dover office and asked to speak to Brooks, who encouraged him to speak to Dinger. (D.I. 160 at A97; D.I. 161 at A266) Frank Crawford left Dinger a voicemail, but neither Crawford nor her husband accepted Dinger's return call because Crawford had already hired a lawyer. (D.I. 161 at A181, A188; D.I. 160 at A65)

Since her layoff, Crawford has managed CTC's operations by securing new projects for CTC and managing the company's finances and employees. (D.I. 161 at A185, A189-90) Crawford has indicated that she does not wish to return to G&L and would not accept reinstatement at G&L if it were offered. (D.I. 161 at A164)

Bursich was laid off by G&L in August 2009. (D.I. 171 at P70) Bursich was rehired by G&L after the final determination in the summer or fall of 2010. (D.I. 172 at P352) To date, Bursich has not received individualized harassment training, although G&L supervisors were notified on how to handle a sexual harassment complaint. (D.I. 172 at P388, P304)

11

## III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the non-moving party." *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986)). Pursuant to Rule

56(c)(1), a party asserting that a fact is genuinely disputed must support its contention either by

citing to "particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made

for purposes of the motion only), admissions, interrogatory answers, or other materials," or by

"showing that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1).

The moving party bears the initial burden of proving the absence of a genuinely disputed

material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The burden then shifts to the

non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.,* 891

F.2d 458, 460–61 (3d Cir.1989). When determining whether a genuine issue of material fact

exists, the court must view the evidence in the light most favorable to the nonmoving party and

draw all reasonable inferences in that party's favor. *See Scott v. Harris,* 550 U.S. 372, 380

(2007); *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). However, the existence of some

evidence in support of the nonmoving party may not be sufficient to deny a motion for summary judgment. Rather, there must be enough evidence to enable a jury reasonably to find for the nonmoving party on the issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.,* 477 U.S. at 322.

## IV.   DISCUSSION

### A.   G&L's Motion for Summary Judgment

#### 1.   Hostile work environment

To establish a claim for hostile work environment under Title VII, a plaintiff must establish that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) *respondeat superior* liability. *See Weston v. Pennsylvania*, 251 F.3d 420, 425-26 (3d Cir. 2001), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In the present matter, the parties' dispute centers on the second prong regarding the severity or pervasiveness of the alleged conduct, and the fifth prong regarding whether G&L may be held vicariously liable for the alleged actions of its employee.

13

### (a)    Severity and pervasiveness of conduct

#### (i)    Legal standard

To determine whether the conduct alleged in support of a hostile work environment claim is sufficiently severe or pervasive,[9] the court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). These factors should be viewed both objectively and subjectively.  The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and the subjective perception must be objectively reasonable. *Id.* at 21-22. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Id.* at 21.  The Supreme Court has held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted). "The mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability." *Weston*, 251 F.3d at 428.

---

[9]Some case law from the Third Circuit defines the standard as "pervasive and regular" discriminatory harassment. *See Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990). However, the Supreme Court set forth the controlling "severe or pervasive" standard in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

#### (ii)     Parties' contentions

In support of its motion for summary judgment, G&L contends that the conduct alleged

by Crawford is not sufficiently severe or pervasive to establish the existence of a hostile work

environment. (D.I. 159 at 11; D.I. 180 at 1)  According to G&L, Crawford's allegations of

severe and pervasive conduct are both factually implausible and insufficient to constitute the type

of environment required to establish a cause of action.  (D.I. 159 at 12)  G&L further alleges that

the severity of the conduct must be considered in the context in which the conduct occurs,

suggesting that Crawford was likely accustomed to certain conduct as a result of her history of

employment in the trucking industry.  (D.I. 180 at 2)

In response, Crawford contends that the harassment by Bursich occurred on a daily basis

during Crawford's six weeks of employment at G&L's Dagsboro office, it entailed over thirty

different acts of harassment, and it encompassed physical, verbal, and non-verbal conduct.  (D.I.

170 at 14)

#### (iii)     Analysis

Viewing the evidence in the light most favorable to Crawford as the nonmoving party, the

court concludes that genuine issues of material fact exist as to the severity and pervasiveness of

Bursich's conduct.  Crawford alleges that Bursich harassed her on a daily basis by making

comments and gestures of a sexual nature, and by occasionally touching her and threatening her

physically.  (D.I. 171 at P61-62; D.I. 174 at P671-72)  Specifically, Crawford contends that

Bursich made sexual noises and gestures, invited her to sit on his lap, tried to look down her

clothes, indicated a desire to smell her, made comments such as "you are as old as you taste" and

15

"I'm watching your ass shake," touched her breast and her earring, and put his arms around her neck when disciplining her. (D.I. 174 at P671-72)  These allegations establish a pattern of conduct consistently related to Crawford's gender. *See Wellman v. Dupont Dow Elastomers L.L.C.*, 414 F. App'x 386, 390 (3d Cir. 2011).  Taking the allegations set forth in Crawford's harassment questionnaire and August 16, 2012 affidavit[10] as true, sufficient evidence exists to create genuine issues of material fact as to the severity and pervasiveness of Bursich's conduct. *See Brown-Baumbach v. B&B Automotive, Inc.,* 437 F. App'x 129, 134 (3d Cir. 2011) ("Considering this range of incidents, combined with their frequency over a span of only four months . . . we conclude that sufficient evidence exists to create genuine issues as to material facts, thus precluding the grant of summary judgment."); *Mertig v. Milliken & Michaels of Del., Inc.*, 923 F. Supp. 636, 645 (D. Del. 1996) ("The sheer number of allegations made by [plaintiff] in her affidavit and deposition demonstrates that there is at least a jury question as to the pervasiveness and regularity of the discrimination."); *Glickstein v. Neshaminy Sch. Dist.*, C.A. No. 96-6236, 1999 WL 58578, at *8 (E.D. Pa. Jan. 26, 1999) (finding genuine issue of material fact as to pervasiveness where plaintiff described a near daily routine of harassment, including being kissed against her will, having her buttocks grabbed, and threatening behavior).

Many of the alleged incidents, taken in isolation, would not rise to the level of sexual hostility required under Title VII. Courts have consistently held that sexual or threatening gestures and offensive comments are not sufficiently severe to establish the existence of a hostile

---

[10] Although G&L has moved to strike portions of Crawford's August 16, 2012 affidavit, it does not seek to strike the paragraphs relating to Crawford's allegations of Bursich's offensive conduct. (D.I. 185)

work environment. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 715-18 (3d Cir.
1997) (allegations of mute gestures, squinting stares, and shaking fists were insufficient to
establish hostile work environment); *Bishop v. Nat'l R.R. Passenger Corp.*, 66 F. Supp. 2d 650,
664 (E.D. Pa. 1999) (staring, leering, and offensive comments, with no physical touching or
threats, was insufficient under Title VII). Inappropriate touching or threatening behavior is
likewise insufficient when it is not severe or occurs only sporadically. *See LaRose v. Phila.
Newspapers, Inc.*, 21 F. Supp. 2d 492, 500 (E.D. Pa. 1998) (allegations that supervisor raised his
hand at the plaintiff, followed her into an office, denied her overtime, and stood in her personal
space were insufficient to establish a claim for hostile work environment); *McGraw v. Wyeth-
Ayerst Labs., Inc.*, C.A. No. 96-5780, 1997 WL 799437, at *5-6 (E.D. Pa. Dec. 30, 1997)
(unwelcome kissing, touching, and frequent requests for a date were insufficient to create a
hostile work environment). The majority of the inappropriate conduct aimed at Crawford falls
into these categories.

However, the court must view all of these instances in their totality, and may not "parse[]
out each event, explaining how and why the separate incidents did not demonstrate that a hostile
work environment existed." *Brown-Baumbach.*, 437 F. App'x at 134 (concluding that weekly
exposure to sexually offensive conduct was sufficient to create a genuine issue of material fact as
to the plaintiff's hostile work environment claim). Under the totality of the circumstances,
Bursich's alleged conduct in the present matter ranges from the offensive to the facially neutral.[11]

---

[11] On the more severe end of the spectrum, Bursich "approached [Crawford] from behind and
put his hands under [her] breasts," and "put both arms around [her] neck while disciplining [her]
about a trucker." (D.I. 174 at P671) Crawford also includes seemingly innocuous comments and
actions by Bursich, such as sitting with his legs open, and telling Crawford that "blue is [his] favorite

Viewing the range of incidents, and considering their daily frequency over a span of six weeks, the court cannot conclude as a matter of law that Bursich's conduct was not sufficiently severe or pervasive. The jury must decide whether to credit Crawford's testimony, thereby precluding summary judgment.

The case law cited by G&L is distinguishable from the facts presently before the court. Specifically, Crawford alleges that the incidents occurred on a daily basis, whereas the plaintiff in *McGraw* was unable to recall how often the incidents occurred. *McGraw*, 1997 WL 799437, at *6. In *Miller v. Aluminum Co. of America*, the court concluded that the offending conduct boiled down to snubs and unjust criticisms of the plaintiff's work, which were not sufficiently severe to create an actionable hostile work environment. *See Miller v. Aluminum Co. of Am.*, 679 F. Supp. 495, 502 (W.D. Pa. 1988), *aff'd*, 856 F.2d 184 (3d Cir. 1988). Likewise, in *Mendoza v. Borden, Inc.*, the alleged conduct consisted of stares and one instance of physical contact that had no strong sexual or gender-related connotation. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247-48 (11th Cir. 1999). In contrast, the present case involves several allegations of physical threats and inappropriate touching in addition to a series of complaints about offensive comments and gestures. The gender-specific and daily nature of these incidents is sufficient to preclude summary judgment in favor of G&L on this factor.

---

color" on a day when Crawford was wearing a blue shirt. (*Id.* at P672)

G&L also cites the Seventh Circuit's decision in *Adusumilli v. City of Chicago* for the proposition that repeated stares and sexual jokes, combined with four instances of unwelcome physical contact, lack sufficient severity or pervasiveness to survive summary judgment. *See Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998). This decision, like *Mendoza*, is not controlling in the Third Circuit.[12] Moreover, the physical contact in *Adusumilli* involved only brief touching of the plaintiff's arm, fingers, or buttocks. *Id.* at 361. In contrast, the present case involves two instances in which Bursich allegedly touched Crawford's breasts and one instance in which he put his arms around Crawford's neck in a threatening manner.

### (b) *Respondeat superior*

#### (i) Legal standard

To survive summary judgment on a hostile work environment claim, a plaintiff must demonstrate that the conduct creating the hostile work environment should be imputed to the employer. *Hemphill v. City of Wilmington*, 813 F. Supp. 2d 581, 588 (D. Del. 2001) (internal citations omitted). An employer's liability for harassment under Title VII depends on the status of the harasser. *Vance v. Ball State Univ.*, ---- U.S. ----, 133 S. Ct. 2434, 2439 (2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in

---

[12]In *Adusumilli*, the Seventh Circuit dismissed the physical conduct as "four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks," separating its analysis of this conduct from the plaintiff's other allegations regarding verbal comments and stares. *Adusumilli*, 14 F.3d at 361. The Seventh Circuit separately analyzed "the most serious conduct, the unwanted touching of Adusumilli's buttocks," but dismissed it as a mild poke that "occurred only once." *Id.* at 362. In contrast, the Third Circuit applies a totality of the circumstances test, and does not isolate one type of conduct from the others in conducting its analysis. *See Brown-Baumbach v. B&B Automotive, Inc.*, 437 F. App'x 129, 134 n.6 (3d Cir. 2011) ("Parsing out the incidents is contrary to both Supreme Court and our precedent which require that the events be viewed in their totality.").

controlling working conditions." *Id.* (holding that "[n]egligence provides the better framework

for evaluating an employer's liability when a harassing employee lacks the power to take tangible

employment actions."). However, if the harasser is the victim's supervisor, the employer may be

held strictly liable. *Id.* at 2437 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761

(1998)).

An employer is subject to vicarious liability for an actionable hostile work environment

created by a supervisor with authority over the employee. *Burlington Indus., Inc. v. Ellerth*, 524

U.S. 742, 761-62 (1998). In *Vance*, the Supreme Court clarified that

> an employer may be vicariously liable for an employee's unlawful harassment
> only when the employer has empowered that employee to take tangible
> employment actions against the victim, *i.e.*, to effect a "significant change in
> employment status, such as hiring, firing, failing to promote, reassignment with
> significantly different responsibilities, or a decision causing a significant change
> in benefits."

133 S. Ct. at 2443 (quoting *Ellerth*, 524 U.S. at 761). If no tangible employment action is taken,

the employer may raise an affirmative defense to liability or damages by showing: "(a) that the

employer exercised reasonable care to prevent and correct promptly any sexually harassing

behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any

preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Ellerth*, 524 U.S. at 765.

When a hostile work environment is created by a co-worker, the employer is not

automatically liable. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d

Cir. 2009). Under the negligence standard that applies in such cases, an employer may be

directly liable for a co-worker's unlawful harassment if the employer failed to provide a

20

reasonable avenue for complaint or, alternatively, if it knew or should have known of the harassment and failed to take prompt remedial action. *Huston*, 568 F.3d at 104; *Hitchens v. Montgomery Co.*, 278 F. App'x 233, 236 (3d Cir. 2008); *see Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007). "An effective grievance procedure – one that is known to the victim and that timely stops the harassment – shields the employer from Title VII liability for a hostile environment." *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 110 (3d Cir. 1994). "Prompt remedial action" is conduct "reasonably calculated to prevent further harassment." *Id.*; *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir. 1997). When the employer's response stops the harassment, there can be no employer liability under Title VII as a matter of law. *Weston*, 251 F.3d at 427; *Bouton*, 29 F.3d at 110 ("By definition, there is no negligence if the [sexual harassment grievance] procedure is effective."). In such situations, the employee cannot require the employer to choose a certain remedial action. *Knabe v. Boury Corp.*, 114 F.3d 407, 414 (3d Cir. 1997).

### (ii)    Parties' contentions

G&L alleges that Crawford's complaint must be evaluated under the standard for harassment by a coworker. (D.I. 180 at 2-3)  Applying this standard, G&L contends that Crawford cannot establish the existence of *respondeat superior* liability because she failed to provide sufficient notice of the harassment allegations against Bursich, and G&L promptly took action to stop the harassment once it learned of the allegations. (D.I. 159 at 12)  If the court determines that Bursich acted as Crawford's supervisor, G&L argues that it should not be held strictly liable for Bursich's conduct because Crawford did not follow the procedures set forth in G&L's anti-harassment policy. (*Id.* at 14-15)

21

In response, Crawford contends that G&L is vicariously liable for the hostile work environment created by Bursich as Crawford's supervisor. (D.I. 170 at 15) Crawford notes that Bursich was listed directly above Crawford on the organizational hierarchy chart of the company, he called Jones to complain that Crawford was improperly favoring CTC trucks, he documented his efforts to warn and advise Crawford about managing CTC business during her workday at G&L, and he admitted that he was in a position to retaliate against Crawford by reducing the work given to CTC. ·(*Id.*) Even if the court concludes that Bursich were not her supervisor, Crawford contends that G&L did not exercise reasonable care because its sexual harassment policy was out of date, preventing Crawford from following the proper reporting channels. (*Id.* at 15-16) Crawford acknowledges that the harassment ceased after G&L transferred Crawford to Dover, but claims that this does not provide G&L with an affirmative defense because Crawford's transfer was the result of G&L's retaliation against her. (*Id.* at 18)

### (iii)    Analysis

Genuine issues of material fact remain as to whether Bursich acted as Crawford's supervisor or her co-worker.[13] Under *Vance*, "tangible employment actions" include any action that "effects a significant change in employment status." "[I]f an individual is empowered by an employer to make reports, recommendations, or evaluations of an employee that lead directly to a significant change in that employee's employment status, that individual would be a 'supervisor' for the purposes of vicarious liability under Title VII." *Gonzalez v. Hostetler Trucking, Inc.*, 2013 WL 5182835, at *8 (S.D. Ohio Sept. 12, 2013).

---

[13]Because *Vance* was decided after the present matter was fully briefed, the parties did not address the legal standard for supervisors articulated in that case.

Viewing the record in the light most favorable to Crawford, the evidence suggests that Bursich had the power to discipline Crawford. Specifically, when Bursich was confronted with Crawford's allegations, he indicated that she was angry with him because he "had recently had strong words with her about handling the trucking assignments wrong." (D.I. 171 at P70) The record also reflects that Bursich repeatedly warned Crawford about managing CTC trucks on G&L time, but that he had hoped to "give her enough rope to hang herself" by allowing the conduct to continue. (*Id.* at P105) Jones testified that Bursich reported his complaints about Crawford's performance to him on several occasions. (D.I. 174 at P570-71) Because this issue was briefed prior to the Supreme Court's decision in *Vance*, it is unclear from the record how much of an impact Bursich's reports, recommendations, and evaluations of Crawford's performance had on the decision to transfer and ultimately terminate Crawford. However, a reasonable jury could conclude that Jones' transfer and ultimate termination of Crawford were the direct result of Bursich's reports, recommendations, or evaluations of Crawford's performance. *See Gonzalez*, 2013 WL 5182835, at *8. The jury must weigh this evidence against the evidence presented by G&L to determine whether Bursich is best characterized as Crawford's supervisor or co-worker.

Having determined that a genuine issue of material fact remains as to whether Bursich is Crawford's co-worker or supervisor, the court need not reach the issue of whether G&L failed to provide a reasonable avenue for complaint or, alternatively, whether G&L knew or should have known of the harassment and failed to take prompt remedial action. *See Huston*, 568 F.3d at 104; *Kunin*, 175 F.3d at 293. For the foregoing reasons, the court concludes that a genuine issue of material fact exists, and G&L's motion for summary judgment is denied with respect to

23

Crawford's hostile work environment claim.

### 2. Gender-based discrimination

A plaintiff alleging discrimination must establish the following four elements by a preponderance of the evidence: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). A plaintiff may satisfy the fourth element by showing that "similarly situated" employees outside of the protected class "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Norman v. Kmart Corp.*, 2011 WL 3794915, at *11 (M.D. Pa. July 28, 2011) (quoting *Davis v. City of Phila. Water Dep't*, 57 F. App'x 90, 92 (3d Cir. 2003)). The question of whether a comparator is similarly situated to the plaintiff is an issue of law. *Moore v. Shinseki*, 487 F. App'x 697, 698 (3d Cir. 2012). "The central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo v. USPS*, 352 F.3d 789, 798 (3d Cir. 2003) (citation and internal quotations omitted).

Once the plaintiff makes out a *prima facie* case of discrimination, the burden shifts to the defendant to state a legitimate, non-discriminatory reason for the employment action. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the defendant

24

meets its burden, the presumption of discriminatory action is rebutted and the plaintiff must prove by a preponderance of the evidence that the defendant's stated reasons are a pretext for unlawful discrimination. *Greenawalt v. Clarion County*, 459 F. App'x 165, 168 (3d Cir. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

To show that the defendant's non-discriminatory reasons for the employment action are a pretext, the plaintiff must submit evidence which "(1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). Although this standard places a difficult burden on the plaintiff, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Fuentes*, 32 F.3d at 765 (internal quotations omitted).

In support of its motion for summary judgment on Crawford's gender discrimination claim, G&L contends that Crawford admitted in her deposition that the same allegations serve as the basis for both her gender discrimination claim and her retaliation claim. (D.I. 159 at 16) Moreover, G&L alleges that Crawford has failed to offer any evidence that she was treated less favorably than similarly situated male employees under similar circumstances. (D.I. 180 at 7)

In response, Crawford contends that her discrimination claim is based on the fact that G&L treated Boyce and Crawford differently when disciplinary issues arose because they were female. (D.I. 170 at 18) Specifically, Crawford notes that she and Boyce were transferred, while

25

Bursich was either not affected by, or benefited from, the employment action taken against Crawford and Boyce. (*Id.*)

The parties do not dispute that Crawford satisfies the first three elements of her *prima facie* case. Instead, the parties' dispute turns on whether Crawford can show that she was terminated as a result of G&L's unlawful discrimination on account of her gender.[14]  Viewing the record in the light most favorable to Crawford, it is evident that Crawford's gender discrimination claim cannot survive G&L's motion for summary judgment.

Crawford does not refer to any evidence in the record indicating that Bursich is a valid comparator. Instead, Crawford bases her allegations on the fact that Bursich sexually harassed her and had previously harassed another female employee. Crawford appears to allege that her conduct in reporting the sexual harassment should be compared to Bursich's conduct in committing harassment. (D.I. 57 at ¶ 123; D.I. 170 at 18) No reasonable jury could conclude that the nature of Bursich's alleged misconduct in sexually harassing a female employee is sufficiently comparable to Crawford's actions in reporting the harassment. *See Dempsey v. Del. Dep't of Pub. Safety*, 579 F. Supp. 2d 616, 622 (D. Del. 2008) ("Since plaintiff here alleges disparate treatment in the form of disparate discipline, it is appropriate to require her to show evidence as part of her *prima facie* case that the nature of her misconduct was comparable to that of male employees, but that the nature of the punishment she received was not.").

---

[14]Crawford does not refer to the record or cite legal authority in support of her gender discrimination claim. In fact, Crawford dedicates only two sentences in her answering brief to addressing the merits of the gender discrimination claim. The court has done its best to consider all evidence in the record and the pertinent case law in analyzing this cause of action. *See* § IV.A.1(b)(iii) at n.13, *supra*.

In light of Crawford's failure to establish a *prima facie* case for gender discrimination, it is unnecessary for the court to determine whether G&L can provide a non-discriminatory reason for its conduct, or whether such a reason is pretextual. G&L's motion for summary judgment is granted with respect to Crawford's gender discrimination claim.

### 3. Retaliation

To establish a *prima facie* claim for retaliation under Title VII, Crawford must show: (1) that she engaged in a protected activity; (2) that G&L took an adverse employment action after or contemporaneous with the protected activity; and (3) the protected activity and the adverse employment action were causally linked. *See Moore v. Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006); *Weston*, 251 F.3d at 430; *see also Wellman v. Dupont Dow Elastomers, L.L.C.*, 414 F. App'x 386, 389 (3d Cir. 2011). Once Crawford establishes a *prima facie* case of retaliation, G&L has the burden to "articulate some legitimate, nondiscriminatory reason" for terminating Crawford. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997). The burden then shifts back to Crawford to establish that there is sufficient evidence for a reasonable factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

The Third Circuit has "indicated that temporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is unusually suggestive of retaliatory motive." *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000) (internal quotations omitted). However,

27

temporal proximity alone is not always sufficient to overcome a defendant's allegations of pretext. *See Andes v. N.J. City Univ.*, 419 F. App'x 230 (3d Cir. 2011) (concluding that district court erred in focusing exclusively on temporal proximity when it found no causal connection between the protected activity and the alleged retaliatory conduct); *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 178 (3d Cir. 2011) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn.").

In a recent case, the Supreme Court concluded that "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . which requires proof that the unlawful retaliation would have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. S. Med. Ctr. v. Nassar*, ---- U.S. ----, 133 S. Ct. 2517, 2533 (June 24, 2013). Therefore, Crawford's protected activity must be the "but-for" cause of G&L's alleged retaliatory action under the causation prong of the *prima facie* case.

In support of its motion for summary judgment, G&L contends that Crawford cannot show the requisite causal link to establish her *prima facie* case for retaliation. (D.I. 159 at 17) Specifically, G&L contends that the decision to move Crawford to the Dover office occurred more than one week before Crawford called Shetzler to report the harassment, and Shetzler was the only G&L employee who knew about Crawford's harassment complaint at the time Crawford was terminated. (*Id.* at 17-18) G&L further alleges that the timing of the events between Crawford's complaint and her layoff is insufficient to establish pretext because six weeks passed between the two events. (D.I. 180 at 8-9) According to G&L, Crawford has failed to produce evidence suggesting that the reason for her transfer represents anything other than an effort to

28

enable her to focus on the growing wait-time arrears, or that her layoff was for any reason other than the fact that the problem she was hired to address had been resolved. (*Id.* at 9)

In response, Crawford contends that she was stripped of her job title and right to overtime pay and was transferred to a dead-end job one day after she complained about Bursich's conduct to Shetzler. (D.I. 170 at 19) According to Crawford, the evidence indicates that Brooks knew about her complaint to Shetzler before she was transferred, and no evidence of record shows that a plan was in place to transfer Crawford or reassign Bursich into Crawford's position. (*Id.*)

The parties agree that Crawford engaged in protected activity when she called Shetzler, and that she was subject to an adverse employment action when she was transferred to Dover and subsequently laid off. As a result, the parties' dispute turns on whether Crawford has established a sufficient causal link between the protected activity and the adverse employment action.

Crawford has presented sufficient evidence to create a factual question as to whether her complaints regarding Bursich's alleged conduct were the but-for cause for her transfer and subsequent termination. First, Crawford presented evidence that she complained of the sexual harassment to Shetzler (D.I. 171 at P59, P65; D.I. 160 at A16), and was transferred to the Dover office the following day with no forewarning or explanation (D.I. 160 at A93-A94; D.I. 172 at P285-86). A reasonable jury could infer from the temporal proximity of these events that Crawford's protected activity and her transfer to Dover were causally linked. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (stating that temporal proximity between the protected activity and the termination is sufficient to establish a causal link). Crawford also produced evidence that the transfer was unfavorable to her because she lost her position as OPC

29

Manager, was forced to commute over 100 miles each day, and was given no meaningful work to perform. (D.I. 173 at P495, 497-98; D.I. 171 at P95; D.I. 160 at A93)

G&L's contentions that the decision to transfer Crawford to the Dover office was made before Crawford called Shetzler, and that Crawford was terminated because the wait-time issue was resolved, are sufficient to meet its relatively light burden. *See Woodson*, 109 F.3d at 920 n.2 (citing *Fuentes*, 32 F.3d at 763) ("The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge."). G&L supplied testimony and affidavits indicating that plans to transfer Crawford were discussed at the July 21, 2008 meeting in the hopes of resolving the wait time issues. (D.I. 161 at A329, A342-43) However, documentation of the July 21, 2008 meeting does not reveal a plan to transfer Crawford to Dover (D.I. 161 at A344), and the record contains no other written correspondence suggesting that G&L planned to transfer Crawford to Dover prior to her telephone call with Shetzler. (D.I. 161 at A344) Jones' affidavit demonstrates only that he decided to transfer Crawford to Dover "after" the July 21, 2008 meeting, without specifying whether the decision was made before or after Crawford's call to Shetzler. (D.I. 161 at A343) As a result, the jury must make a credibility determination to resolve the question of when the decision to transfer Crawford was made. Moreover, as previously discussed at § IV.A.1(b)(iii), *supra*, a genuine issue of material fact remains as to whether Shetzler informed others of Crawford's call.

Although G&L has offered legitimate nondiscriminatory reasons for transferring Crawford, the evidence presented by Crawford is sufficient to create a question of fact as to whether those reasons were a pretext for retaliation. A reasonable jury could conclude that

30

Crawford's transfer and termination would not have occurred in the absence of G&L's retaliatory motive. For these reasons, I recommend that the court deny G&L's motion for summary judgment on Crawford's retaliation claim.

### 4. Promissory Estoppel / Detrimental Reliance and Breach of Covenant of Good Faith and Fair Dealing

In support of its motion for summary judgment, G&L contends that Crawford's state law claims for promissory estoppel / detrimental reliance and breach of the implied covenant of good faith and fair dealing must fail as a matter of law because Crawford points to no evidence demonstrating that any harm resulted to Crawford from G&L's alleged promise or misrepresentation. (D.I. 159 at 19-20) Instead, G&L alleges that Crawford's husband pulled his trucks out of G&L's rotation and stopped performing work for G&L before Crawford was laid off. (*Id.* at 20) According to G&L, Crawford confirmed that it was CTC's decision to refuse to perform work for G&L when her counsel communicated that CTC did not wish to bid on any future G&L projects. (*Id.*) Moreover, G&L contends that the claim for breach of the implied covenant fails because there is no evidence from which a reasonable jury could conclude that the alleged misrepresentation was made in bad faith. (*Id.*) G&L alleges that Frank Crawford's sham affidavit claiming that G&L terminated its relationship with CTC is insufficient to support Crawford's state law claims. (D.I. 180 at 10)

In response, Crawford contends that G&L's business with CTC dropped by over ninety percent following her transfer. Crawford alleges that CTC did not withdraw its trucks from G&L, but rather CTC's drivers were forced to look for other work due to Bursich's retaliation against Crawford via CTC. (D.I. 170 at 20) With respect to Crawford's claim for breach of the

31

implied covenant of good faith and fair dealing, Crawford contends that G&L made a promise to entice Crawford to accept the position but had no intention of keeping the promise, as evidenced by Crawford's transfer a month after she was hired. (*Id.*)

I recommend that the court grant G&L's motion for summary judgment with respect to Crawford's state law claims. Both claims require a showing that G&L terminated its relationship with CTC in violation of its alleged promise not to let Crawford's employment with G&L affect CTC's relationship with G&L. However, the evidence on the record indicates that Frank Crawford called Hall to terminate his relationship with G&L. For the reasons explained in the Report and Recommendation regarding the parties' motions to strike, which issues simultaneously with the instant Report and Recommendation, the portions of Frank Crawford's affidavit pertaining to Crawford's contentions regarding her state law claims have been stricken from the record and will not be presented to the jury for review. Specifically, Frank Crawford consistently maintained that he did not pull his trucks out of River II and did not remember calling Hall to complain about the favoritism shown to other truckers until he was shown telephone records proving that he had called Hall. (D.I. 160 at A78; D.I. 173 at P414) Upon reviewing the telephone records, Frank Crawford indicated in his sworn affidavit that he contacted Hall to complain that CTC's trucks were being treated differently than other hired haulers, that CTC had lost four drivers in a month due to the way they were treated at G&L, and that CTC's truck drivers were being sent out for sand and stone when they came to G&L's yard. (D.I. 174 at P666-67) Frank Crawford's affidavit is inconsistent with his prior testimony and will be stricken, and his deposition testimony indicating that he did not remember calling Hall will remain on the record for the reasons set forth in this court's Memorandum Opinion on the

parties' motions to strike, which issued contemporaneously herewith. No reasonable jury could credit Frank Crawford's testimony regarding his contact with Hall on September 3, 2008 in light of the fact that the telephone records prove that he placed the call, and Hall's testimony supports the telephone records.

To the extent that Crawford bases her state law claims on the drastic decline in business between G&L and CTC following Crawford's transfer, the state law claims cannot survive summary judgment. Crawford provides no evidence or testimony to rebut G&L's contention that she used her position as OPC Manager at G&L to increase the amount of business received by CTC trucks. The undisputed evidence on the record reflects that Crawford's favoritism caused problems among the drivers at G&L, and Crawford was advised on more than one occasion to treat the trucks more fairly. Crawford has presented no evidence indicating that the amount of business CTC trucks received from G&L dropped to levels below the levels CTC trucks received prior to Crawford's assumption of the OPC Manager duties. In fact, the invoices Crawford cites refute her contentions. (D.I. 171 at P25-28) A rough calculation indicates that CTC received about $9,976 in April 2008, and $8,138.75 in May 2008. (*Id.*) The parties dispute the amount of control Crawford had over the truck rotation in June 2008, but it is undisputed that she had nearly complete control over the rotation in July 2008, when CTC's numbers rose to about $41,920, or more than four times the amount CTC received before Crawford began working at G&L. (*Id.*) In August 2008, after Bursich resumed control of the rotation, CTC earned about $9,640, an amount that is solidly within the range earned by CTC prior to Crawford's employment with G&L. Crawford's calculations appear to be based on a self-serving window of time and a

33

vaguely described method of computation.[15]  (D.I. 170 at 20)  No reasonable jury could conclude

that this drop in business was prejudicial to CTC when CTC had obtained similar levels of

business from G&L in the period prior to Crawford's employment with G&L.

For these reasons, I recommend that the court grant G&L's motion for summary

judgment as to Crawford's claims for promissory estoppel / detrimental reliance and breach of

the covenant of good faith and fair dealing.

### B.    Crawford's Motion for Partial Summary Judgment

In support of her motion for partial summary judgment, Crawford contends that the

record contains no evidence that she failed to mitigate her damages.  (D.I. 158 at 7)  Crawford

alleges that substantially equivalent work was not available to her following her termination from

G&L, her return to full-time employment at CTC constitutes mitigation, and G&L failed to prove

that Crawford's decision to work at CTC was unreasonable.  (*Id.* at 7-8)

In response, G&L contends that mitigation is a factual determination to be made by a jury

only after the jury determines liability, and genuine issues of fact remain as to whether Crawford

withdrew from the job market entirely.  (D.I. 164 at 9-11)  G&L alleges that Crawford's

continued employment at CTC does not satisfy her duty to mitigate, and her temporary

employment with the Census Bureau likewise fails to pass muster because there is no evidence

that she sought more permanent employment.  (*Id.* at 11)  According to G&L, disputed issues of

fact exist regarding the reasonableness of Crawford's employment decisions after her layoff by

---

[15]Specifically, Crawford alleges that "[a]fter Plaintiff was replaced by Bursich the business G&L gave CTC dropped by over 90% the last 16 days the company [sic] worked together from its baseline in June prior to Plaintiff taking over the scheduling of trucks." (D.I. 170 at 20)

G&L, precluding an award of summary judgment on the issue. (*Id.* at 12-14)

An employee who prevails on the merits of a Title VII claim has a statutory duty to mitigate his or her damages by diligently searching for substantially equivalent employment,[16] but the employer bears the burden of proving the employee's failure to mitigate. *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 864 (3d Cir. 1995); *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32 (1982). "To meet its burden, an employer must demonstrate that (1) substantially equivalent work was available, and (2) the Title VII claimant did not exercise reasonable diligence to obtain the employment." *Id.* Whether or not an employee has met his or her duty to mitigate damages is a determination of fact, which is subject to the clearly erroneous standard of review. *Booker*, 64 F.3d at 864; *see also Ellis v. Harrisburg Area Cmty. Coll.*, 2007 WL 328600, at *6 (M.D. Pa. Jan. 31, 2007).

An employer may meet its burden to show a lack of reasonable diligence on the employee's part by establishing that the employee willfully incurred losses by unjustifiably refusing adequate interim employment. *See Tubari Ltd., Inc. v. N.L.R.B.*, 959 F.2d 451, 453-54 (3d Cir. 1992). The reasonableness of a Title VII claimant's diligence should be evaluated in light of the individual characteristics of the claimant and the job market. *See id.* at 454. "Generally, a plaintiff may satisfy the reasonable diligence requirement by demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment." *Booker*, 64 F.3d at 865. Although an employee's efforts need

---

[16]"Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990).

not be successful, the employee must exercise good faith in attempting to secure a position. *Id.*; *see also Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x 4, 12 (3d Cir. 2005).

If the employee has made no effort to obtain substantially equivalent employment, "the circumstance of a scarcity of work and the possibility that none would have been found even with the use of diligence is irrelevant." *Tubari*, 959 F.2d at 454 (quotations omitted). "A willful loss of earnings has been found where the alleged victim has failed to stay in the labor market, refused to accept comparable employment, failed to search diligently for other work, or voluntarily quit alternative employment without cause." *Holocheck v. Luzerne County Head Start, Inc.*, 2007 WL 954308, at *15 (M.D. Pa. Mar. 28, 2007); *see also Conway v. Hercules*, 831 F. Supp. 354, 359 (D. Del. 1993).

I recommend that the court deny Crawford's motion for partial summary judgment. The jury must determine whether Crawford's actions constitute a withdrawal from the employment market, thereby negating G&L's burden to show the availability of substantially equivalent work. The record suggests that Crawford continued her employment with CTC after her layoff from G&L, instead of finding additional permanent employment to replace her position at G&L. In *Wooley v. Colonial School District*, the court faced a similar factual scenario in which the employee maintained another job before, during, and after the alleged act of discrimination occurred. 1993 WL 431208, at *1 (D. Del. May 11, 1993). The court in *Wooley* determined that the defendants were entitled to a jury instruction on failure to mitigate regardless of the availability of equivalent work. *Id.* at *2 ("Plaintiff's decision to remain in his current employment makes it pointless for defendants to offer evidence of the potential job opportunities plaintiff may have found. No matter what opportunities awaited plaintiff, plaintiff had made his

36

choice not to seek them out."). In keeping with this court's decision in *Wooley*, I recommend that the court deny Crawford's motion for partial summary judgment.

Moreover, a reasonable jury could find that Crawford's temporary employment with the Census Bureau is insufficient to demonstrate a proactive effort to obtain permanent employment. *See Holocheck*, 2007 WL 954308, at *15 (holding that sporadic work for a restaurant over a two to three month period was insufficient to preclude a finding that the plaintiff withdrew from employment where the plaintiff made no effort to obtain more permanent employment). The same is true of Crawford's seasonal employment at H&R Block, a position she maintained before she was laid off by G&L. A reasonable jury could find that Crawford's continued seasonal employment at H&R Block does not demonstrate a proactive effort to obtain permanent employment to replace the position she lost at G&L.

The Third Circuit's decision in *Anastasio v. Schering Corp.* is distinguishable from the facts presented in the instant case because the evidence on the record in *Anastasio* suggested that the plaintiff had applied for sixty jobs but received no job offers. 838 F.2d 701, 708 (3d Cir. 1988). As a result, the employer's failure to produce evidence showing that comparable work was available was fatal to its defense regarding the plaintiff's failure to mitigate damages. In contrast, the record in the present matter reflects no such efforts on Crawford's part to obtain permanent employment. Crawford also cites to the District of Maryland's decision in *E.E.O.C. v. CTI Global Solutions, Inc.*, which is not binding on this court, and is also distinguishable from the facts of the instant case because the plaintiff "networked heavily, posted resumes online, applied for numerous positions, and attended job fairs." 815 F. Supp. 2d 897, 912 (D. Md. 2011).

37

## IV.   CONCLUSION

For the foregoing reasons, I recommend that the court: (1) grant-in-part and deny-in-part G&L's motion for summary judgment; and (2) deny Crawford's motion for partial summary judgment regarding the failure to mitigate damages.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).  The objections and responses to the objections are limited to ten (10) pages each.

The parties are directed to the court's Standing Order In Non Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the court's website, www.ded.uscourts.gov.

Dated: December 9 , 2013

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE